UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORDAN CHIRICO,<br><br>Defendant. | **SEALED SUPERSEDING<br>INDICTMENT**<br><br>S1 25 Cr.<br><br>S(1) 25 Crim     |

## COUNT ONE
### (Investment Adviser Fraud)

The Grand Jury charges:

1. From in or about 2020 through in or about June 2024, JORDAN CHIRICO, the defendant, engaged in a scheme to defraud 3|5|2 Capital ABS Master Fund LP (the "352 Fund"), a hedge fund that was part of Jefferies Financial Group's Leucadia Asset Management. As the portfolio manager for the 352 Fund, CHIRICO was entrusted with investing hundreds of millions of dollars on behalf of the fund's investors and owed them fiduciary duties of loyalty and care. In breach of those duties, through a series of conflicted transactions, CHIRICO caused the 352 Fund and its affiliates to pour almost $100 million into what he came to learn was a Ponzi scheme masquerading as a water machine company. As he made those investments, CHIRICO had secret, undisclosed financial stakes in the very fraud he was feeding with his investors' money.

2. JORDAN CHIRICO, the defendant, had a significant personal investment in the water machine company, called Water Station Management, LLC ("Water Station"), holding a joint venture partnership worth over $7 million. When Water Station needed a capital infusion, the company launched a $70 million bond issuance. CHIRICO invested millions of the 352 Fund's assets without fully disclosing his personal stake in Water Station, his monthly payments exceeding $90,000 from Water Station, or the $1.6 million he had received from referring friends

and family members to invest in the company. After investing the 352 Fund's money, CHIRICO sold his interests back to Water Station without disclosing that he was being paid with bond proceeds originating from, among others, the 352 Fund and its investors. CHIRICO also deliberately omitted other conflicts that jeopardized the fund's investment, including millions of dollars that Water Station's owner, Ryan Wear, and Water Station owed CHIRICO in loan and note repayments.

3. By summer of 2023, JORDAN CHIRICO, the defendant, had learned of serious issues at Water Station that threatened the value of the 352 Fund's investment, including Water Station's inability to locate and provide proof of purchase for thousands of water machines supposedly collateralizing its bonds. Rather than sound the alarm, CHIRICO—who was personally owed more than $1 million by Ryan Wear—insisted that Wear and Water Station prioritize repaying him before paying many other creditors, including, at times, bondholders. Then, in January 2024, Wear admitted to CHIRICO that thousands of bond collateral machines did not exist at all and that Wear had misappropriated tens of millions of dollars in bond proceeds to buy traditional vending machines and real estate. Despite learning of this massive fraud—which another Water Station investor described to Wear and CHIRICO as "the largest franchise fraud case in the history of the United States"—CHIRICO continued to fail to disclose Water Station's problems to the 352 Fund or its investors. Instead, CHIRICO directed the 352 Fund to buy another $19 million of additional Water Station-issued bonds, some of the proceeds of which Wear used to repay CHIRICO. Indeed, from April 2022 to February 2024, CHIRICO received from Wear and Water Station more than $11 million in joint venture earnings, buyouts, and loan and note repayments. Ultimately, CHIRICO authorized the 352 Fund to pay more than $92 million for Water Station bonds before the company collapsed and defaulted on its obligations.

## CHIRICO's Personal Investment in Water Station

4. In 2018, JORDAN CHIRICO, the defendant, became a personal investor in Water Station, a company that marketed, managed, maintained, and serviced a machine known as the WST-700 (a "Water Machine")—a system that Ryan Wear had developed for dispensing purified drinking water by the gallon using an alkaline mineralization process to create the taste of fresh spring water. Water Station's business model included selling Water Machines to investors and then operating and managing them as part of a "joint venture" or franchise program. As one such investor, between 2018 and 2021, CHIRICO personally purchased a total of 854 Water Machines, at $8,500 per machine, for a total of approximately $7.259 million, through a company he created and owned with his wife called C3 Capital, Inc. ("C3 Capital").

5. In 2018, JORDAN CHIRICO, the defendant, purchased his first 350 Water Machines for approximately $2.975 million. CHIRICO funded most of the purchase price with a Small Business Administration ("SBA") loan from a lender ("Lender-1"). Water Station agreed to collect revenue from and otherwise service the Water Machines and to pay C3 Capital half the Water Machines' monthly net profits after expenses. Then, in 2019, CHIRICO asked Ryan Wear to change his joint venture arrangement from a split of his Water Stations' net profits to a flat 15% yearly return on his Water Machines' purchase price. From that point forward, C3 Capital received a monthly payment of approximately $37,000. In March 2020, CHIRICO increased his investment in Water Station by purchasing another 300 Water Machines for approximately $2.55 million, funded mostly with another SBA loan, bringing his total machine ownership to 750 Water Machines. After purchasing these additional Water Machines, C3 Capital received a monthly payment of approximately $68,000. In mid-to-late 2021 CHIRICO again increased his investment in Water Station by purchasing another 104 Water Machines for approximately $1,487,500,

bringing his total machine ownership to 854 Water Machines. Part of the purchase price was financed with a loan from a financial institution ("Lender-2"). After that purchase of Water Machines, from October 2021 through September 2022, C3 Capital received a monthly payment of approximately $90,000.

6.     In addition to his personal investment in Water Station through C3 Capital, JORDAN CHIRICO, the defendant, received more than $1.6 million in fees from Ryan Wear between December 2020 and February 2022 for referring friends and family members to Water Station's joint venture program.

### CHIRICO's Misleading Disclosures About His Investment in Water Station

7.     In May 2020, after making millions of dollars of personal investments in Water Station, JORDAN CHIRICO, the defendant, joined Leucadia Asset Management LLC ("LAM"), a registered investment advisor and wholly owned subsidiary of Jefferies Financial Group, Inc., based in New York, New York. CHIRICO joined LAM to establish a new hedge fund—the 352 Fund—focused on asset-backed securities in the consumer, transportation, equipment, small business, structured settlement and whole business securitization industries, and served as its portfolio manager. As the portfolio manager, CHIRICO had the power to make investment decisions on behalf of the 352 Fund, and he owed fiduciary duties of care and utmost good faith and loyalty, including an affirmative duty to act with full and fair disclosure of all material facts, to the 352 Fund and its investors whose capital CHIRICO was vested with the discretion to manage.

8.     As a LAM employee, JORDAN CHIRICO, the defendant, was also bound by Jefferies' policies that required employees to disclose and seek approval of any outside business activities. Those policies required all employees to devote their full time and efforts to the business

of the firm, and avoid activities that might conflict with, or appear to interfere or conflict with, the employee's responsibilities to LAM and its customers. The company also expressly prohibited employees, including CHIRICO, from serving as officers or directors for private companies where such service would create a real or perceived conflict of interest. An employee, like CHIRICO, seeking to engage in outside business activity was required to report the outside activities to Jefferies' compliance department. Additionally, LAM employees were also required to annually certify that they had reported and received approval of all outside business activity, and immediately report to the compliance department any material changes, conflicts, and or perceived conflicts to previously approved outside activity.

9. Notwithstanding these reporting and approval obligations, after joining LAM, JORDAN CHIRICO, the defendant, repeatedly omitted and concealed his outside ownership interest in Water Station and the thousands of dollars he was receiving in monthly income from joint venture payments. In August 2020, CHIRICO reported that he did not "have any employee/employee-related business activities/affiliations to disclose," even though he owned 750 Water Station through C3 Capital and was receiving approximately $68,000 per month in joint venture payments. Then, in December 2020, CHIRICO disclosed the existence of his company, C3 Capital, and described his business as an "[i]nvestment in Water related vending Machines within retail establishments," but wholly omitted mention of Water Station or the millions of dollars of Water Machines that he owned. CHIRICO also falsely listed his anticipated compensation as $0, notwithstanding the fact that he was receiving $68,000 in monthly payments. CHIRICO also obscured the nature of his business activity by stating that it started on January 1, 2021, instead of 2018 when C3 Capital was created and CHIRICO first purchased Water Machines. CHIRICO also completed annual compliance certifications in December 2020,

December 2021, January 2022, March 2023, and January 2024 in which CHIRICO falsely certified that he had disclosed all outside business affiliations, and omitted any mention of his investment in Water Station.

### CHIRICO Directs the 352 Fund to Invest in Water Station While Secretly Cashing Out of His Investment in the Company

10. After making his own investments in Water Station, JORDAN CHIRICO, the defendant, encouraged Ryan Wear to raise capital for Water Station through a bond offering. The subsequent bond issuance afforded Water Station capital to purchase and deploy Water Machines, which were supposed to be either (i) new machines manufactured by an affiliated entity of Water Station, or (ii) machines that had previously been sold to joint venture partners, which would be repurchased and owned by Water Station. The Water Machines and the revenue they generated were supposed to secure Water Station's payment obligations under the bonds, such that the obligations would be fully secured by collateral. As part of the bond offering, Water Station issued Class A notes in the aggregate principal amount of $56.25 million, and Class B notes in the aggregate principal amount of $15 million. The Class A notes were purchased by a regional bank (the "Class A Noteholder"), and in April 2022, CHIRICO arranged for the 352 Fund and an affiliate, Jefferies Strategic Investments, LLC ("JSI"), to purchase the Class B notes.

11. Before directing the 352 Fund and its affiliate to purchase Water Station's Class B notes, JORDAN CHIRICO, the defendant, deliberately concealed and omitted from LAM and the 352 Fund investors that he was conflicted and acting in violation of his fiduciary duties. CHIRICO failed to disclose and concealed that he owned more than $7 million of Water Machines; that he was receiving more than $90,000 per month from Water Station; that CHIRICO had referred friends and family members to Water Station's joint venture program, who were also owed

monthly payments from Water Station; and that he had received more than $1.6 million from Water Station for making those referrals.

12. Shortly after JORDAN CHIRICO, the defendant, caused the 352 Fund to make its significant investment in Water Station bonds, he began discussions to sell his Water Machines back to Water Station. In August 2022, CHIRICO proposed selling his company, C3 Capital, to Ryan Wear or one of his companies for $9,194,000, consisting of $8,113,000 for CHIRICO's 854 Water Machines at $9,500 per machine, and $1,081,000 for "outstanding referral" fees. But the terms of the bond offering, from which the money to buy out CHIRICO would come, capped the purchase price of Water Machines at $8,500 per machine. To circumvent that restriction, which existed to protect bondholders like the 352 Fund, CHIRICO suggested that he and Wear value his Water Machines at $8,500 per machine, for a total of $7,259,000, but that he also be given an undisclosed seller's note for $1,935,000, so that he would be paid a total of $9,194,000. CHIRICO stated that the note would not be paid off with proceeds from the bond issuance that had just been completed, but insisted that Wear make quarterly payments and pay off the note as early as possible "based on company liquidity." CHIRICO was then paid $7,259,000 from Water Station's bond proceeds. In connection with the sale, Wear also forgave $470,000 in loans that had previously been made to CHIRICO through C3 Capital.

13. Before consummating his sale of his Water Machines back to Water Station, JORDAN CHIRICO, the defendant, deliberately omitted any mention of the conflicted transaction from LAM and the 352 Fund investors, in violation of his fiduciary duties. CHIRICO failed to disclose that he was selling his Water Machines back to Water Station just months after he caused the 352 Fund to invest in the company; that he was receiving in excess of $7 million in bond proceeds from Water Station; that, in connection with the sale, Ryan Wear was forgiving $470,000

loans to CHIRICO; that he and Wear had agreed to a $1.9 million seller's note as an end-run around the maximum purchase price set forth in the bond offering materials; and that the note would provide for ongoing payments to CHIRICO. Each of these undisclosed transactions were contrary to the interests of the 352 Fund investors as holders of Water Station bonds as they depleted cash available to Water Station and obligated future payments that could (and sometimes were explicitly contemplated to) take priority over bond repayment.

14.     In January 2023, with more than $1.5 million owed on the seller's note, JORDAN CHIRICO, the defendant, encouraged Ryan Wear to issue additional Water Station bonds worth approximately $25 million. As part of that first supplemental bond offering, the Class A Noteholder purchased $19.875 million of additional Class A notes, and the 352 Fund and JSI purchased an additional $5.3 million of Class B notes at CHIRICO's direction. CHIRICO made these additional investments on behalf of the 352 Fund and JSI without disclosing his own ongoing financial relationship with Water Station and, in fact, concealing it from LAM.

**CHIRICO Learns of Missing Water Machines and Makes Undisclosed Loans to Wear**

15.     In summer of 2023, the company responsible for managing the bond collateral notified Ryan Wear and JORDAN CHIRICO, the defendant, that it was unable to locate a significant number of Water Machines that were supposed to be collateral for the Water Station bonds—specifically, more than 3,000 bond collateral Water Machines did not appear to be generating any revenue. By this time, Wear had purportedly acquired approximately 10,593 Water Machines as collateral for the Water Station bonds in which the 352 Fund had invested. The bond collateral manager arranged for a survey of a sample of physical locations where the Water Machines were supposed to be located, only to learn that 163 of the 164 visited locations had no Water Machines on site. The collateral manager informed Wear and CHIRICO, and Wear

struggled to explain the more than 3,000 missing Water Machines that were supposed to have been purchased with certain draws of Water Station bond proceeds. The bond collateral manager told Wear and CHIRICO that Water Station had until the end of November to either demonstrate that the bondholders' collateral was in good working condition and collecting revenue, or to return the cash purportedly used to buy those machines.

16. As evidence emerged suggesting that the bonds were severely undercollateralized and calling into serious question how Ryan Wear had spent millions of dollars of bond proceeds, JORDAN CHIRICO, the defendant, did not notify the 352 Fund investors or LAM. Instead, CHIRICO continued to collect hundreds of thousands of dollars from Water Station as a creditor of the company. Indeed, not only was CHIRICO owed money on the seller's note, but he also had made an undisclosed loan to Water Station in May 2023, which was repaid in June 2023 with 14% interest. Then, in September 2023, after learning of the missing Water Machines, CHIRICO loaned another $500,000 to Wear. CHIRICO did not disclose this loan to LAM or to the investors in the 352 Fund in violation of his fiduciary duties.

17. Notwithstanding his fiduciary duties to the 352 Fund and its affiliates, JORDAN CHIRICO, the defendant, colluded with Ryan Wear to prioritize repayments to CHIRICO over payments to Wear's other creditors, including the Water Station bondholders. For example, in October 2023, after learning that Wear was expecting to receive over $400,000 in incoming funds, CHIRICO told him that he wanted "a payment to my wife and I of 100k to get us started" with the remaining balance being paid to CHIRICO's preferred list of joint venture partners—friends and family—who were owed money. CHIRICO also told Wear that once they "settle up IN FULL … on the 450k balance you owe me" he would "be willing to do another short term loan" to get CHIRICO's preferred list of joint venture partners "their next payments for October so that they

are all completely current and up to date." CHIRICO assured Wear that repaying CHIRICO and making payments to the joint venture partners, rather than bondholders, would be fine because Wear would "have plenty of cash to make the bond payment" with money from a third-party lender, even though—as CHIRICO knew—the bond payments were supposed to be made from revenue generated by the more than 10,000 Water Stations collateralizing the bonds. Consistent with CHIRICO's demands, Wear transferred $450,000 to CHIRICO in October 2023. In turn, CHIRICO made another short-term loan to Wear in November 2023. CHIRICO did not disclose the repayments or the new loan to LAM or to the investors in the 352 Fund, in contravention to his disclosure and fiduciary obligations to those investors.

### CHIRICO Increases the 352 Fund's Investment in Water Station Despite Evidence of Fraud

18. By November 2023, JORDAN CHIRICO, the defendant, knew that Water Station was failing to make timely transfers of Water Machine revenue for bond payments, that Ryan Wear had prioritized the payment of other creditors, including CHIRICO, over bondholders, and that Wear had not provided evidence that he had used bond proceeds to actually purchase a significant number of Water Machines—collateral that was supposed to secure the 352 Fund's investment. Nevertheless, CHIRICO significantly increased the 352 Fund's and JSI's investments in Water Station. In December 2023, CHIRICO, on behalf of the 352 Fund and its affiliates, purchased $76.125 million of Water Station Class A notes from the Class A Noteholder for 82 cents on the dollar—more than quadrupling the Water Station holdings of the 352 Fund and its affiliates.

19. In December 2023, JORDAN CHIRICO, the defendant, who was still owed more than $1 million on the seller's note and $300,000 on other loans he made to Ryan Wear, orchestrated a bond modification to release additional bond money to Water Station. As soon as

bond proceeds were released to Water Station, proceeds were used to make repayments to CHIRICO.

20. In January 2024, JORDAN CHIRICO, the defendant, continued to receive complaints from JV partners that Water Station was struggling to make payments, hearing from one JV partner, for example, who had purchased 563 units with a 27.9% fixed return, that his regular payments had ceased in April 2023. Then, that same month, it was confirmed for CHIRICO that thousands of Water Machines that were supposed to be collateral for the Water Station bonds did not exist. CHIRICO received data from a Water Station employee indicating that there were only 2,342 Water Machines in Water Station's vendor management system, and the bond collateral manager informed CHIRICO that only 1,824 of these Water Machines were pledged as collateral for the bonds. At the time, there were supposed to be more than 10,000 Water Machines collateralizing the Water Station bonds.

21. Shortly after learning those facts in January 2024, JORDAN CHIRICO, the defendant, had a call with another Water Station joint venture partner. During the call, CHIRICO and the investor discussed how there were thousands of Water Machines missing, and that the Water Station bonds were severely undercollateralized. CHIRICO noted that thousands of the devices that had been identified as bond collateral were, in fact, traditional vending machines, not Water Machines. CHIRICO then added Ryan Wear to the call and confronted him about the fact that there were only 2,342 Water Machines. CHIRICO questioned Wear about what happened to the money from investors, and Wear admitted that he improperly used bond proceeds to instead buy traditional vending machines and real estate. Wear further admitted that it "would be a challenge" to deliver the Water Machines he claimed he had purchased and agreed that he had bought vending machines instead of Water Machines. With CHIRICO present, the other investor

on the call then told WEAR that he sold "$110 million of stuff that . . . does not exist," that this was "the largest franchise fraud case in the history of the United States," and that he was "going to jail." CHIRICO, however, did not tell LAM or the 352 Fund anything about how Wear had perpetrated a fraud.

22. Notwithstanding Water Station's business troubles, his discovery that thousands of Water Machines that were supposed to be collateralizing the bonds did not exist, and the evidence that Ryan Wear had committed a massive fraud, JORDAN CHIRICO, the defendant,—who was still owed more than $1 million on his seller's note—pressed forward and committed the 352 Fund to purchase additional newly issued Water Station bonds. On or about February 2, 2024, Water Station issued an additional $15 million of Class A Notes and an additional $4 million of Class B Notes, which were purchased by the 352 Fund and its affiliates. In authorizing that investment, CHIRICO concealed and deliberately did not disclose to LAM or the 352 Fund investors that the existing bonds were undercollateralized, that Wear had misrepresented that thousands of Water Machines existed, that Wear had misused tens of millions of dollars from the bond offering, or that Wear still owed CHIRICO more than $1 million. In fact, just a few days after the new sale of Water Station bonds, Wear used proceeds from the sale to make a significant repayment on the seller's note to CHIRICO.

23. On or about February 14, 2024, the parties amended the bond agreement to authorize the release of additional money from a bond account to Water Station and, in doing so, Water Station disclosed that the bond collateral "contains a significant portion of traditional vending machines (rather than water vending machines) and certain of the report data and characteristics of such machines contained inaccuracies." This disclosure, however, was materially misleading as it made no mention of Wear's admission to JORDAN CHIRICO, the defendant, that

12

thousands of water machines that were supposed to be collateralizing the bonds did not exist and that Wear had misappropriated tens of millions of dollars of bond proceeds to buy vending machines and real estate, contrary to the terms of the bond. Furthermore, this disclosure came only after the 352 Fund and its affiliate purchased $19 million of Water Station bonds and after some of those proceeds were used to make a significant repayment on CHIRICO's sellers note.

24. Within months of the 352 Fund's last investment, Water Station was unable to pay bondholders and was forced to pay from reserve accounts. In June 2024, Water Station failed to make its required interest payment to bondholders, and in August 2024 the company entered involuntary bankruptcy. Ryan Wear never made another payment to the bondholders. To this day, the 352 Fund has not received any principal payments on its $106.925 million of Water Station bonds, for which it paid more than $92 million.

## Statutory Allegations

25. From at least in or about 2020 through in or about June 2024, in the Southern District of New York and elsewhere, JORDAN CHIRICO, the defendant, willfully and knowingly, while acting as an investment advisor, by use of the mails and a means and instrumentality of interstate commerce, directly and indirectly, (a) employed a device, scheme, and artifice to defraud a client and prospective client; (b) engaged in a transaction, practice, and course of business which operated as a fraud and deceit upon a client and prospective client; and (c) engaged in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, CHIRICO, concealing and mischaracterizing his private financial interests in Water Station's and Ryan Wear's business activities and withholding from his clients material information regarding Water Station's bonds and financial condition, caused the 352 Fund and its affiliates to engage in a series of transactions in Water Station bonds in violation of his fiduciary duties.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
Title 18, United States Code, Section 2.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

26. The allegations contained in paragraphs 1 through 24 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

27. Between in or about 2023 and in or about June 2024, in the Southern District of New York and elsewhere, JORDAN CHIRICO, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, CHIRICO deliberately failed to disclose material information regarding Water Station's bonds and financial condition, and caused the 352 Fund and its affiliates to engage in fraudulent transactions in Water Station bonds, in violation of his fiduciary duties.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATIONS

28. As a result of committing the offenses alleged in Counts One and Two of this Indictment, JORDAN CHIRICO, the defendant, shall forfeit to the United States, pursuant to Title

18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

29. If any of the above-described forfeitable property, as a result of any act or omission of JORDAN CHIRICO, the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

_____  
GRAND JURY FOREPERSON

_____  
JAY CLAYTON  
United States Attorney